**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **Crim. Nos.**   **21-CR-145 &** |
| | : | **21-CR-163 (JDB)** |
| | : | |
| **v.** | : | |
| | : | |
| **OLATUNJI DAWODU,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing.  For the reasons herein, the United States requests that the Court sentence the defendant to a period of twelve years of incarceration (the middle of the range under the Rule 11(c)(1)(C) plea); the government further requests that the Court impose a period of five years of supervised release. The government is not requesting any fines or restitution in this case, other than required court costs.  In support of this sentence, the government states the following.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Procedural History

On February 22, 2021, a grand jury returned an indictment charging Defendants Spencer and Dawodu with one count of Conspiracy to Distribute 400 grams or More of a Mixture and Substance Containing a Detectable Amount of Fentanyl (Case No. 21-CR-145).  On March 1, 2021, a grand jury returned a related indictment charging Defendant Dawodu and Alex Ogando with one count of Conspiracy to Distribute 400 grams or More of a Mixture and Substance Containing a Detectable Amount of Fentanyl (Case No. 21-CR-163).  The charges stem from the

1

defendants' involvement in narcotics trafficking conspiracies where they used darknet markets to distribute pills pressed with fentanyl, using the U.S. Postal Service.[1]

Search warrants were executed at residences associated with Defendants Dawodu, Ogando, and Spencer on or about February 23, 2022.  Law enforcement recovered the following items during the searches of the residences:

- **Dawodu's Residence** (Ft. Lauderdale, FL)

    - Approximately 1,400 grams of pills containing suspected fentanyl (consistent with pills ordered through the Darknet markets);

    - Numerous electronic devices; and

    - Approximately 30 USPS mailing envelopes, consistent with those used to ship drugs during the course of the conspiracy.

- **Ogando's Residence** (Providence, RI)

    - Approximately $370,000 in U.S. currency;

    - A money counter;

    - Numerous electronic devices;

    - More than 1,770 grams of pills that field tested positive for fentanyl; and

    - Approximately 30 USPS Priority Mail envelopes with filled pill orders (pills had been packed in the envelopes, but no labels had yet been affixed) containing an additional approximately 363 grams of suspected fentanyl pills.

- **Spencer's Residence** (Ft. Lauderdale, FL)

    - More than $12,000 in U.S. Currency;

    - Numerous digital devices; and

    - Ledgers.

---

[1] Over the course of the two conspiracies, Defendant Dawodu acknowledged that the offense involved between twelve and thirty-six kilograms of a mixture and substance containing Fentanyl. Plea Agreement (ECF No. 24), ¶ 6(A).

Following their arrests, Defendants Spencer and Dawodu appeared for an initial appearance before Magistrate Judge Jared M. Strauss in the Southern District of Florida (Ft. Lauderdale) on February 24, 2021.  A detention hearing was set for March 3, 2021; however, after several requested continuances from defense counsel, the detention hearing was ultimately held on March 31, 2021 before Magistrate Judge Strauss.  At the conclusion of the hearing, Judge Strauss denied the government's request to detain the defendants pending trial and released Defendants Spencer and Dawodu on cash bonds and placed them on home detention.  The government filed a Motion for Emergency Review and Appeal of Release Order.  *See* ECF No. 6.

On  April 16, 2021, a hearing was held on the government's Motion.  On April 19, 2021, this Court issued an Order granting the government's Motion, ordering both defendants detained after concluding that "no condition or combination of conditions of release will reasonably assure defendants' appearance and the safety of the community if the defendants are released pending trial."  *See* ECF No. 13 at 1; *see also* ECF No. 14.  The defendants have remained detained since that hearing and on August 16, 2022, Defendant Dawodu entered a guilty plea.

### B.     Plea Agreement

On August 16, 2022, Defendant Dawodu was the first of the three defendants to enter a guilty plea.  *See* August 16, 2022 Minute Order.  Pursuant to Rule 11(c)(1)(C), the defendant agreed to plead guilty to Count One in each Indictment (Case Nos. 21-CR-145 & 21-CR-163), charging the defendant with Conspiracy to Distribute 400 grams or More of a Mixture and Substance Containing Fentanyl, in violation of 21 U.S.C. § 846.  The Rule 11(c)(1)(C) plea agreement included an agreed upon sentence of 10-14 years of incarceration.  *See* ECF No. 24 at ¶ 5.  The plea was based on the following facts[2]:

---

[2] *See* ECF No. 25 (Statement of Offense).

## BACKGROUND

Beginning in approximately June 2019, the FBI, in partnership with other federal agencies, including the United States Postal Inspection Service and Food and Drug Administration's Office of Criminal Investigations, began investigating a drug trafficking organization that was distributing counterfeit oxycodone pills containing fentanyl (hereafter "pills") on Darknet markets. Specifically, the pills were being sold via Darknet markets using the moniker "PolarSprings." The pills were shipped to customers across the United States using the United States Postal Service ("USPS").   The moniker would accept online orders, receive payment for these orders in cryptocurrency, such as bitcoin, and mail the orders to the recipients via the USPS.  Individual customers would also communicate with the operator of the moniker via messaging applications to coordinate direct purchases of pills that were paid for in cryptocurrency and shipped to the purchasers via the USPS.  During the course of the investigation, packages of pills were shipped by PolarSprings to the District of Columbia. As a result of the investigation detailed below, law enforcement was able to identify Defendants Alex Ogando and Olatunji Dawodu as working together to coordinate, process, package, and mail orders using the PolarSprings moniker.

## POLARSPRINGS' OPERATION ON VARIOUS DARKNET MARKETS

Beginning in approximately March 2019 and continuing through February 2021, PolarSprings operated as a vendor across several Darknet markets, including Wall Street, Empire, Icarus, Deep Sea, DarkMarket, and ToRReZ. PolarSprings conducted thousands of transactions on these markets, distributing hundreds of thousands of pills across the country.

Beginning in March 2019 on Wall Street Market, PolarSprings advertised for sale "oxycodone m30 pressed [2-3 day shipping]."  The listing further described the pills as "oxycodone m30 pressed just right with fentanyl best around guaranteed potency is set at the right

level pressed m30 lets do business." PolarSprings completed approximately 47 orders on Wall Street between March 2019 and April 2019, when the market was taken down and the computer servers associated with the market were seized by law enforcement.

On or about April 21, 2019, PolarSprings registered an account on Empire Market. Law enforcement reviewed the account and determined it was consistent with the PolarSprings account on Wall Street Market. On Empire Market, PolarSprings advertised "oxycodone m30 pressed." The listing further read, "oxycodone m30 pressed just right with fent." PolarSprings completed approximately 7,020 sales on Empire Market until the market conducted an exit scam in August 2020.

Following the Empire Market exit scam, PolarSprings migrated to a series of other Darknet markets, including Icarus, Deep Sea, DarkMarket, and ToRReZ Market. PolarSprings created advertisements on these markets to sell pills. Icarus Market conducted an exit scam, Deep Sea and DarkMarket were taken down by law enforcement, and ToRReZ voluntarily ceased operations.

During the course of the investigation, law enforcement identified PolarSprings' Pretty Good Privacy ("PGP") public keys on its vendor accounts on Wall Street, Empire, Icarus, Deep Sea, DarkMarket, and ToRReZ.[3] Law enforcement confirmed the PGP public key listed for PolarSprings on these markets was identical, confirming the PolarSprings account operator was consistent across the different markets.

---

[3] PGP encryption is used by Darknet vendors to encrypt their communication with customers. When a user creates a PGP encryption key, the user is provided a public and private key. Darknet vendors advertise their public keys on marketplaces as a way for customers to encrypt messages sent to them, while keeping their private keys secret to be used to decrypt the messages. As Darknet markets have been disrupted over the past few years and vendors create new accounts on new markets, use of the same public PGP key across markets is considered the best way for a vendor to prove that the vendor is who the vendor purports to be, as only the true vendor would have access to the private key.

By combining records from the Wall Street server with sales and review information posted to the other markets where PolarSprings operated, law enforcement identified the number of transactions conducted by PolarSprings and calculated the minimum number of pills sold in those transactions and the approximate dollar value of the transactions:

| Market | Activity range | # of Transactions | Estimated Pill Count | Estimated Proceeds |
|---|---|---|---|---|
| Wall Street | 3/23/2019 - 4/21/2019 | 51 | 1,162 | $11,535 |
| Empire | 4/21/2019 - 8/17/2020 | 7,020 | 172,702 | $1,551,000 |
| Icarus | 8/29/2020 - 9/9/2020 | 115 | 2,300 | $20,700 |
| Deep Sea | 9/26/2020 - 10/14/2020 | 10 | 1,276 | $11,484 |
| ToRReZ | 8/29/2020 - 2/23/2021 | 511 | 37,134 | $334,206 |
| Total | | 7,707 | 214,574 | $1,928,925 |

Based on analyses conducted by forensic chemists employed by the Drug Enforcement Administration, the pills have an average weight of 0.125 grams / pill. Based on a volume of more than 214,000 pills, the approximate total weight of pills sold by PolarSprings was at least 26.75 kilograms.

## CREATION OF POLARSPRINGS WALL STREET ACCOUNT

When law enforcement seized the server associated with Wall Street Market, the server contained extensive records regarding transactions and accounts associated with the market. These records included bitcoin addresses associated with payments to the market and withdrawals from the market by PolarSprings. On or about March 23, 2019, the vendor bond fee of approximately $200 was paid to a Wall Street market bitcoin address ending -PjJo. Markets charge a vendor bond fee for prospective vendors to limit the number of fraudulent vendor accounts created; once paid, the vendor account can create listings to sell products on the market. Law enforcement analysis of

the wallet that paid this fee revealed it had received bitcoin from Witness #1, a peer-to-peer bitcoin trader, on or about March 22, 2019, that was then used to pay the PolarSprings vendor bond fee. Law enforcement determined the same wallet had also previously received bitcoin from Witness #1 on or about March 13, 2019, and used that bitcoin to pay the vendor bond fee for an account "XYZebra" on Wall Street market. That account created listings to sell pills but did not complete any sales.

Wall Street server records also showed PolarSprings withdrew proceeds from sales of pills to bitcoin address ending -byAn, which was also contained within the wallet that paid the vendor bond fee. This wallet then conducted transactions linked to Witness #1 consistent with the sale of bitcoin, representing the sale of illicit bitcoin for cash. Witness #1 identified a photo of Ogando as the individual they communicated with regarding the purchase and then sale of bitcoin and provided text message communications which were saved in their chat application regarding trades conducted with Ogando.

### UNDERCOVER PURCHASES

On or about June 4, 2019, an FDA Office of Criminal Investigations (OCI) undercover agent purchased ten (10) oxycodone pills from PolarSprings on the Empire market. On or about June 10, 2019, the FDA OCI received ten (10) blue pills as advertised on the PolarSprings vendor page on the Empire market. The package was shipped to Ashburn, Virginia, via a USPS Priority Mail envelope, from the Miami, Florida area. Affixed to the package was a printed label with a return address, which included a fictitious name and address. Inside of the USPS Priority Mail envelope was a yellow padded manila envelope. Inside this envelope was a white letter-sized envelope, which contained another yellow envelope. The pills were located inside this envelope. The pills were sent to the FDA laboratory and the test results were positive for fentanyl.

On or about January 21, 2020, an FBI undercover agent purchased thirty (30) oxycodone pills from PolarSprings on the Empire market. On or about January 28, 2020, the FBI received thirty (30) blue pills as advertised on PolarSprings vendor's page on the Empire market. The package was shipped to Washington, D.C. via a USPS Priority Mail envelope, from the Boston, Massachusetts area. Affixed to the package was a printed label with a return address, which included a fictitious name and address.  Inside of the USPS Priority Mail envelope was a yellow padded manila envelope. Within the yellow padded manila envelope was a light green envelope. Within the light green envelope, there were thirty (30) light blue pills in clear vacuum-sealed plastic. The pills were sent to the DEA laboratory and the test results were positive for fentanyl.

Between March 2020 and December 2020 additional undercover purchases of pills from PolarSprings were conducted on Empire and ToRReZ Markets. Orders were packaged similarly to the above orders from PolarSprings and were shipped from either the Miami, Florida, or Boston, Massachusetts areas, to undercover mailboxes in Washington, D.C., Virginia, and Maryland. The pills from all orders were sent to DEA or FDA laboratories for testing and were positive for fentanyl.

**SURVEILLANCE OF OGANDO AND SEARCH OF OGANDO'S RESIDENCE**

On January 27, 2021, law enforcement conducted physical surveillance at Ogando's residence and observed him depart his residence and meet Witness #3, in the parking lot of a fast food restaurant. Ogando provided Witness #3 a paper shopping bag.

Law enforcement review of electronic media devices at Ogando's residence identified communications between Ogando and Witness #3 regarding the above meeting, as well as coordination of other meetings regarding drops and obtaining more envelopes. Law enforcement also identified communications between Witness #3 and Dawodu regarding payments via bitcoin

and CashApp, at least one of which was paid by Ogando.  Law enforcement interviewed Witness #3 who did not deny shipping packages on behalf of Ogando but did not know the contents of the packages.

On February 23, 2021, law enforcement executed a search warrant at Ogando's residence and recovered the following items:

- o   Approximately $370,000 in U.S. currency;

- o   A money counter;

- o   Numerous electronic devices;

- o   Approximately 1,697 grams of pills that DEA lab testing revealed were positive for fentanyl; and

- o   Approximately 30 USPS Priority Mail envelopes with filled pill orders (pills had been packed in the envelopes, but no labels had yet been affixed) containing more than 200 grams of pills that DEA lab testing revealed were positive for fentanyl.














On February 20, 2021, prior to the execution of the search warrants, law enforcement placed an undercover purchase of thirty pills that never arrived.  One of the pre-filled envelopes had "30" written on it but did not yet have a shipping label affixed, likely representing the package corresponding with the undercover purchase. The undercover order never arrived due to the execution of the search warrant and the seizure of the filled envelopes.

Law enforcement also recovered several cryptocurrency wallet seed phrases inside of Ogando's residence that connect Ogando to PolarSprings transactions.  A seed phrase is a list of words which store all the information needed to recover Bitcoin funds on-chain.  Wallet software will typically generate a seed phrase and instruct the user to write it down on paper. If the user's computer breaks or their hard drive becomes corrupted, they can download the same wallet software again and use the paper backup to get their bitcoins back.

Law enforcement also located a note that stated "P.Springs," the phrase "concord11," and seed phrases and PIN numbers consistent with those used to recover Darknet market accounts. Another note was determined to contain the password for a cryptocurrency wallet located on a cell phone at the residence which contained bitcoin and Monero addresses used by PolarSprings on DarkMarket. The same phone contained the communications with Witness #2 and the Wickr account "pswsm" associated with PolarSprings.



A search of a laptop computer located in Ogando's residence revealed it contained the PGP private key associated with the PolarSprings account. Technical exploitation revealed the password for this key was "concord11." Using this private key, law enforcement was able to decrypt messages that PolarSprings received, confirming that the operator of the PolarSprings vendor account could decrypt messages using the laptop recovered from Ogando's residence.

## SEARCH OF DEFENDANT DAWODU'S RESIDENCE

A search warrant was also executed at Defendant Dawodu's residence in Florida on February 23, 2021.  Evidence of Dawodu's involvement in conspiracies to traffic pressed fentanyl pills was recovered from that residence, to include:

- Approximately 1,303 grams of pills that DEA lab testing revealed were positive for fentanyl (consistent with pills ordered through the darknet markets);

- Numerous electronic devices; and

- Approximately 30 USPS mailing envelopes, consistent with those used to ship drugs during the course of the conspiracy.

Photographs of items recovered from Dawodu's residence include:





 

## COORDINATION WITH DAWODU REGARDING DISTRIBUTION OF PILLS

During the course of the investigation into PolarSprings, law enforcement identified one of the moniker's most prolific customers based on data from the Wall Street market server ("Customer-1"). Although Customer-1 initially purchased pills over the darknet, he later began purchasing pills directly with PolarSprings off-market.

Investigators obtained and reviewed records of payments Customer-1 sent from May 2019 to January 2021. More than 20 of these payments were received by bitcoin wallets recovered from seed phrases at Ogando's residence. The payments corresponded with USPS records identifying Priority Mail packages received by Customer-1. Law enforcement also identified WhatsApp chats during this same window of time between Ogando and Dawodu wherein they discussed pill counts and packages to be shipped, including references to packages destined for Customer-1.

These WhatsApp messages between Ogando and Dawodu include references to quantities of "m" and "v" pills that were on hand (sometimes referred to as "Mars" and "Venus" or "Vanessas"), referring to the distinct offerings of M30 and V4812 pills on the PolarSprings sites. In a series of messages sent in early March 2020, there were references to "6.2k" of "m" and "5.7k" of "v"; just a week later, the quantities on-hand had diminished dramatically, to "Venus 3750" and "Mars 1250". A week later, text messages confirm that the supply is almost gone ("almost done") and indicates a need for another thousand pills ("we need 1k").

## INVOLVEMENT WITH OTHER POLARSPRINGS SHIPPER

Laboratory analysis of the exterior packaging of a May 2020 undercover order from PolarSprings on Empire Market identified a fingerprint of Individual #1. Law enforcement identified records from Dawodu's iCloud of communications between Dawodu and Individual #1 in March and April 2020. These communications included messages from Individual #1 of a list of six addresses labeled "Drops" that were identified as Post Office mailing locations and

screenshots showing other Post Office locations in the Boston, Massachusetts, area, where PolarSprings packages were commonly shipped. Communications were also identified between Ogando and Dawodu regarding payment to Individual #1 and their involvement in dropping.

## DAWODU'S INVOLVEMENT IN DISTRIBUTING
## PRESSED PILLS THROUGH A SECOND MONIKER

In addition to his involvement in distributing pills pressed with fentanyl via the PolarSprings moniker, law enforcement also identified Dawodu working in conjunction with Luis Spencer to coordinate, process, package, and mail orders from another moniker: johncarter7. As with PolarSprings, johncarter7 was distributing pressed pills containing fentanyl on Darknet markets. Specifically, the pills containing fentanyl were being sold via Darknet markets using the moniker "johncarter7" and, in some cases, using online communication platforms to facilitate the sale of said narcotics. As with the pills sold by PolarSprings, the drugs from johncarter7 were shipped to customers across the United States using the USPS. The moniker would accept online orders, receive payment for these orders in cryptocurrency, such as bitcoin, and mail the orders to the recipients via the USPS. In addition to communicating via the Darknet markets, individual customers would also communicate with the operator of the moniker via messaging applications, including Jabber, to coordinate direct purchases of pills pressed with fentanyl that were paid for in cryptocurrency and shipped to the purchasers via the USPS.

*Johncarter7's Operation on Various Darknet Markets*

Beginning in approximately February of 2017 and continuing through at least August 2020, johncarter7 operated as a vendor across several Darknet markets, including AlphaBay, Wall Street, Dream, and Empire. As with the investigation into PolarSprings, law enforcement identified johncarter7's PGP public keys and confirmed the PGP public key listed for johncarter7 on

AlphaBay, Dream, Wall Street, and Empire Markets was identical, confirming the johncarter7 account operator was consistent across the different markets.

By combining records obtained from the AlphaBay and Wall Street servers with sales and review information collected from Dream and Empire Markets, law enforcement calculated the number of transactions conducted by johncarter7, the minimum number of pills sold in those transactions, and the approximate dollar value of the transactions:

| Market | Date Range for Moniker Activity | # of Transactions | # of Pills | Total Bitcoin Sales |
|---|---|---|---|---|
| AlphaBay | 2/14/17 – 7/5/17 (sales conducted) | 735 | 43,870 | $406,780 (incl. shipping) |
| Dream | 6/20/15 – 3/19/19 | 800 | 8,000 | $141,440 (not incl. shipping) |
| Wall Street | 3/16/19 – 4/23/19 | 50 | 1,707 | $22,346 (incl. shipping) |
| Empire | 04/26/19 – 8/16/20 | ~1,154 | ~18,761 | $196,855 (incl. shipping) |
| TOTAL | | 2,379 | 72,338 | $767,421 |

Forensic chemists employed by the Drug Enforcement Administration conducted analyses of numerous pills seized during the course of the investigation and using weights of those pills, the total approximate weight of pills containing fentanyl in the transactions in the above chart is at least 9,042 grams.[4]

---

[4] Using a conservative weight of .125 grams per pill (some pills weighed as high as .15 grams) and multiplying that weight by the total number of pills, results in a total of 9,042 grams of a mixture and substance containing fentanyl.  This quantity does not account for thousands of additional pills sold directly (as evidenced by the Jabber records).

*Spencer's Operation of the Johncarter7 Moniker*

The PGP public key for the johncarter7 account, consistent across all markets, was decoded and law enforcement identified an email address associated with Spencer embedded in the PGP public key. This email address was identified as an account used and controlled by Spencer to handle various aspects of the johncarter7 operation.

Information on the AlphaBay server seized in 2017 provided extensive insights into the johncarter7 account. For instance, law enforcement identified a bitcoin address ending in -cPqS that funded the first 32 deposits to the johncarter7 account, between June 1, 2015, and January 5, 2016, including purchases of several kilograms of acetyl fentanyl. The QR code for the wallet using this address was found within Spencer's iCloud account.[5]   Additionally, some narcotics purchases by the AlphaBay account were shipped to a Rhode Island address connected to Spencer.

As with the investigation into PolarSprings, law enforcement made a number of undercover purchases of pills from johncarter7, beginning in March of 2019 and continuing to June of 2019. All of the packages from the johncarter7 moniker were shipped via USPS Priority Mail envelopes. Affixed to the packages were printed labels which displayed return addresses with fictitious names and addresses.  The pills were packaged similarly across the markets:  inside of each USPS Priority Mail envelope was a padded envelope containing another paper envelope. Inside of the paper envelopes were pills which were either wrapped in paper, or contained within a vacuum seal type of packaging.

In addition to selling pills over darknet markets, johncarter7 transitioned to selling pills directly to customers using a messaging application.  In late April of 2019, undercover officers

---

[5] A wallet QR Code makes transactions easier for cryptocurrency users – rather than sending long strings of numbers and letters as a wallet address, users can share simply share a scannable code to initiate a transaction.

began communicating with johncarter7 directly and arranged multiple purchases of narcotics from April of 2019 through December of 2019.  Each of the packages purchased using the messaging application contained pills that were packaged in a similar fashion to the undercover purchases from the johncarter7 moniker (described above).  In conducting these direct deals, Johncarter7 provided the undercover agent with bitcoin addresses and law enforcement has ultimately traced those addresses back to Spencer.

Law enforcement executed a search of Spencer's residence on February 23, 2021, during which numerous electronic devices were located – including laptop computers, cell phones, and cryptocurrency hardware wallets. To the extent law enforcement was able to access and review the electronic devices, they identified files, programs, and applications on the devices consistent with the operation of a Darknet vendor account, including, among others, cryptocurrency wallets and the chat application that johncarter7 used to communicate with customers for the direct deals described above. Law enforcement also identified cryptocurrency seed phrases which were used to recover corresponding cryptocurrency wallets. These wallets were determined to contain bitcoin received from Defendant Ogando as well as various other types of cryptocurrencies which had been withdrawn from accounts used by Spencer, including an account that received johncarter7 proceeds.

*Surveillance of Dawodu and Spencer*

During the course of the johncarter7 investigation, law enforcement surveilled Spencer on numerous occasions in the Miami, Florida, area. During the surveillance, law enforcement observed the Defendants on numerous occasions.  Spencer and Dawodu frequently communicated over the telephone and via messaging (for instance, law enforcement observed approximately 1,496 phone contacts between the two from June 17, 2019, to November 15, 2020).

During the course of this surveillance, law enforcement observed Dawodu drop packages containing drugs ordered via the Johncarter7 moniker into the mail stream.  For instance, on or about July 15-17, 2019, law enforcement conducted surveillance of Dawodu and observed him leave his residence in Florida with a white plastic bag which appeared to have a square box inside of it.  Law enforcement subsequently observed Dawodu park near a blue USPS mailbox, located on the corner of NW 1st Avenue and NW 183rd Street, in the parking lot of the Miami Gardens Office Center.  Law enforcement then observed Dawodu retrieve a white plastic bag from the vehicle which appeared to contain a square box.  Dawodu walked towards the blue USPS mailbox and placed the contents of the white plastic bag, which appeared to be a large USPS shipping box or multiple flat rate envelopes, inside the blue USPS mailbox.

Shortly thereafter, an Inspector with the United States Postal Inspection Service ("USPIS") retrieved two (2) Priority Mail envelopes from the blue USPS mailbox which were similar to the packages Dawodu placed inside the mailbox (and consistent with the packages that the UC purchased from Spencer on Jabber).  Those packages were seized by USPIS for further investigation.  The Priority Mail envelopes were addressed to individuals located in New Haven, Connecticut, and Denver, Colorado.  Law enforcement subsequently interviewed the intended recipients of the two packages and the intended recipients advised that the pills in the packages had been ordered from the johncarter7 moniker on the Empire Market.

Approximately one month later, on or about August 27, 2019, law enforcement observed Dawodu exit his residence, and drive his vehicle to the same blue USPS mailbox, located on the corner of NW 1st Avenue and NW 183rd Street, in the parking lot of the Miami Gardens Office Center.  Law enforcement then observed Dawodu place a white package inside of the blue USPS mailbox.  After Dawodu left the USPS mailbox area, law enforcement maintained constant

surveillance on the USPS mailbox until a postal carrier arrived. FBI agents observed 11 USPS Priority Mail envelopes collected from the USPS mailbox located on the corner of NW 1st Avenue and NW 183rd Street. The mailings had similar packaging and postage labels as the packages previously received from johncarter7 during undercover purchases, and as the packages that were retrieved from the USPS blue mailbox during surveillance on or about July 15-17, 2019. Law enforcement seized one package for further investigation.

Law enforcement subsequently contacted an intended recipient of a package that had been seized from the blue USPS mailbox after Dawodu had been observed dropping items at the USPS mailbox on August 27, 2019.  The intended recipient provided consent to search the package and the package contained fifty-two light blue pills similar in appearance to the pills purchased during the undercover and Darknet market purchases described above.  The pills were later tested and found to contain fentanyl.

*Spencer and Dawodu's Use of a Storage Unit*

During the course of the investigation, law enforcement observed Dawodu and Spencer frequenting a storage unit in Davie, FL. The Defendants appeared to use the unit to further the drug trafficking operations described herein.  In November and December of 2019, Spencer was captured on video bringing a laptop computer, printer box, USPS priority mail envelopes, and other materials to the facility. The video further shows Spencer using a bag around his hand when handling envelopes, and he came out of the storage unit wearing latex gloves with envelopes in a bag.  Further, in January of 2020, Dawodu was also observed outside of the storage unit handling a white plastic bag that appeared to contain USPS priority envelopes.

## DIRECT SALE OF PILLS TO CONFIDENTIAL SOURCE

In May 2020, a confidential source contacted Dawodu and ordered 100 pills via text message. Dawodu shipped the pills to Washington, DC in a USPS envelope. The packaging was consistent with orders shipped by johncarter7 and PolarSprings. In October 2020, the source ordered another 100 pills from Dawodu. Dawodu met the source in person in Rhode Island to complete the transaction and provided a USPS envelope containing the pills. In early January 2021 the source ordered another 100 pills from Dawodu and they met in South Attleboro, Massachusetts, to complete the transaction.

On January 25, 2021, the source contacted Dawodu to order another 50 pills. On February 5, 2021, Dawodu contacted the source and advised he had just shipped 100 pills to the source. The package was shipped from a Post Office in Opa Locka, Florida, and GPS tracking surveillance on Dawodu's vehicle revealed it was at that Post Office on that date. Further, security footage from the Post Office on that date revealed an individual consistent with Dawodu mailing a package around the time the package of pills was mailed.

## DISCUSSION AND RECOMMENDATION

## I.    Generally Applicable Legal Principles

When determining the appropriate sentence, the district court should consider all of the applicable factors set forth in 18 U.S.C. § 3553(a).  See United States v. Gall, 128 S. Ct. 586, 596 (2007).  The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal

conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for –

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –

(i) issued by the Sentencing Commission ...; and

(ii) that, . . . are in effect on the date the defendant is sentenced; ...

(5) any pertinent policy statement –

(A) issued by the Sentencing Commission ... and

(B) that, . . . is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

## II.   **Defendant's Sentencing Guidelines Calculation**

### A.   **Total Offense Level**

#### 1.   *Plea Agreement*

Under the plea agreement, the parties agreed that Defendant Dawodu was accountable for at least 12KG but less than 36 KG of Fentanyl (relevant conduct attributable to the defendant). *See* ECF No. 24, ¶ 6(A).  With that quantity of narcotics as the relevant conduct, the Base Offense Level under 2D1.1 is 36.  *See id*.  That Base Offense Level is increased by the following Specific Offense Characteristics:

- U.S.S.G. 2D1.1(b)(7) – Mass Marketing/Use of Interactive Computer Service **(+2 points)**;

- U.S.S.G. 2D1.1(b)(12) – Maintained Premises **(+2 points)**;

- U.S.S.G. 2D1.1(b)(13) – Knowingly Misrepresented Substance Containing Fentanyl **(+4 points)**.

*See* ECF No. 24, ¶ 6(A).  With respect to the Specific Offense Characteristics, listings on the marketplaces expressly referenced that the pills for sale – although pressed to look and appear like M30 pharmaceutical pills (Oxycodone) – were in fact pressed with fentanyl.  For instance, the attached Johncarter7 listing on Empire claim to be "Oxycodone Best in the Market M30" but later note that they are pressed with "just the right amount of [fentanyl]":



Moreover, the pills purchased during the undercover buys in this case consistently tested positive for fentanyl, as detailed below:

| Date | Market | Pills Ordered | Package Shipped From | Controlled Substance |
|------|--------|---------------|----------------------|----------------------|
| 3/19/19 | Dream | 10 | Providence, RI area | fentanyl and acetyl fentanyl (fentanyl analog) |
| 3/27/19 | Wall Street | 10 | Hallandale Beach, FL | fentanyl and acetyl fentanyl (fentanyl analog) |
| 4/12/19 | Wall Street | 10 | Miami, FL | fentanyl |
| 6/12/19 | Empire | 20 | Miami, FL | fentanyl and acetyl fentanyl |
| 6/19/19 | Empire | 50 | Miami, FL | fentanyl and acetyl fentanyl (fentanyl analog). |

The premises enhancement stems from the conspiracy's use of Defendant Dawodu and Ogando's residences to package and distribute narcotics.  Each location had all of the materials necessary to fill orders (including packaging supplies, mailing supplies, and pills).  Notably, the scale of the operation at Ogando's residence – interrupted in-progress by law enforcement at the time the search warrant was executed – evidenced a large scale packing operation:



A pole camera captured Dawodu entering the Ogando residence (carrying what appears to be supplies), in addition to his regular comings and goings from the storage unit in Florida that was being used in furtherance of the operation with Spencer (screengrabs below).



Dawodu (left) and Ogando (right) entering the Ogando residence where large-scale trafficking operation was subsequently interrupted by law enforcement.

 

Dawodu at storage unit (image on left) and Dawodu with Spencer (Dawodu on left, Spencer in red shorts on right) bringing supplies into and out of Florida storage unit.

Finally, the use of mass marketing and interactive computer services is established through the use of what is effectively an e-Bay for illicit narcotics. The darknet markets – like e-Bay –

provide users with the ability to leave reviews, provide customers with detailed product information, and provide a means of leaving complaints or comments about the vendor.

Sample listings from Dream include:



Sample listings from Wall Street market include:



27



With a Base Offense Level of 36 and an additional 8 points in Specific Offense Characteristics, the Total Offense Level is 44. *Id.* After a reduction of three points for acceptance of responsibility, this Offense Level is reduced to 41 points. *Id.*

2. *PSR Calculations*

The PSR calculates a Total Offense Level of 43. *See* Draft PSR ¶ 80. This higher offense level results from a higher Base Offense Level. *See* Draft PSR ¶ 80. Specifically, the relevant conduct quantity in the PSR is based on an offense involving more than 36 kilograms of fentanyl (38.86 kilograms) and has a base offense level of 38. USSG § 2D1.1(c)(5) and (a)(1). *Id.* That quantity is derived from aggregating the following quantities (26.82 kg (PolarSprings), 9.04 kg (johncarter7), 1.697 kg (seized from Ogando), and 1.303 kg (seized from Dawodu)). *See* Draft PSR n.6. The government does not dispute the PSR writer's calculations; however, to the extent there could ultimately be factual disputes about the drug quantities that were reasonably foreseeable to Defendant Dawodu, the parties agreed to a total quantity in the plea agreement that

was not in dispute (resulting in Base Offense Level 36) and would ask that the Court adopt that quantity and base offense level.

Were the Court to adopt the PSR writer's calculations, the same Specific Offense Characteristics would apply and the Total Adjusted Offense Level would be 46.  *See* Draft PSR ¶ 76.  After acceptance of responsibility, this offense level would be reduced to 43.  *See* Draft PSR ¶ 80.

### B.      Criminal History Category

The PSR writer calculates the defendant to have a criminal history score of zero as he has no scorable convictions.  *See* Draft PSR ¶ 83; *see also* Plea Agreement ¶ 6(B).   *See* PSR ¶ 28-38. Defendant Dawodu is ineligible for the Safety Valve exception that could make him eligible to be sentenced under the 10-year mandatory minimum in this case as he qualifies as "an organizer, leader, manager, or supervisor of others in the offense."  Specifically there is evidence of his supervision and direction of an individual with the initials B.J. with respect to his involvement in dropping packages at Defendant Dawodu's direction.  He would also be ineligible for the safety valve as he did not meet with the government and provide information and evidence concerning the offense or offenses that were part of the course of conduct.

### C.      Sentencing Guideline Range

Based on the Total Offense Level (41) and Criminal History Score of Zero, the parties estimated a Sentencing Guidelines range of 324-405 months.  *See* Plea Agreement ¶ 6(C).  In light of the increased Base Offense Level described above, the PSR writer calculates the range as life (Total Offense Level of 43 and Category I Criminal History).  *See* Draft PSR ¶ 124.  The Court must impose a term of supervised release of at least five years, per count.  21 U.S.C. § 841(b)(1)(A)(vi); Draft PSR ¶ 131.

29

III.   **Sentencing Recommendation**

As stated above, the government requests that the Court sentence the defendant to **144** months of incarceration on Count 1 (Case No. 21-CR-145), to run concurrently to **144** months of incarceration on Count 1 (Case No. 21-CR-163), for a total sentence of **144** months of incarceration (total of 12 years of incarceration), to be followed by 5 years of supervised release.

A.   **The Nature of the Offense**

The defendant's conduct in this case presents a serious danger with respect to the safety of the community.  In setting a 10-year mandatory minimum for fentanyl at 400 grams, Congress recognized the danger of this particular drug, which is responsible for a national opioid crisis that has resulted in increase in fatalities.[6]   The statistics regarding the dangers of fentanyl are staggering:

- In Maryland in 2020, there were 803 firearms deaths (CDC); but 2,342 fentanyl related deaths (Maryland Department of Health Annual Report).

- In DC in 2019, there were 141 firearms deaths (Johns Hopkins); but 257 Fentanyl related deaths (DC Office of the Chief Medical Examiner).

- 95% of opioid overdoses in DC in 2021 involved fentanyl (DC Office of the Chief Medical Examiner).

- The number of fentanyl related deaths in DC is clearly on the rise.  There were 257 in 2019; 382 in 2020; and 402 in 2021 (DC Office of the Chief Medical Examiner).

- 2 milligrams of Fentanyl can be a lethal dose (https://www.dea.gov/resources/facts-about-fentanyl).

A recent Washington Post article explored the devastating impacts of fentanyl overdoses in communities across the country, the article cites "more than 107,000 drug overdose deaths in 2021 alone, there are many Greenvilles — places where the powerful opioid fentanyl and other

---

[6] *See, e.g.*, Fentanyl Deaths Climbing, DEA Washington Continues the Fight *available at* https://www.dea.gov/stories/2022/2022-02/2022-02-16/fentanyl-deaths-climbing-dea-washington-continues-fight

drugs have produced clusters of overdose deaths, or picked off victims one at a time." *See Drugs Killed 8 Friends, One by One, in a Tragedy Seen Across the Country*, December 2, 2022 (*available at* https://www.washingtonpost.com/health/interactive/2022/drug-overdose-deaths-fentanyl-greenville-nc/).

The conduct at issue in this case spanned a lengthy period of time:  johncarter7 distributed pills on darknet markets from at least June of 2015 through August of 2020 (more than five years); while PolarSprings distributed pills from March of 2019 up until the date of law enforcement's raid of Defendant Ogando's residence in February of 2021 (nearly two years).  Over the course of the operation of the two monikers, Johncarter7 sold more than 70,000 pills through the markets with an estimated sales value of $767,000.  Over the course of the operation of PolarSprings, the moniker distributed more than 214,000 pills, with an estimated proceeds of more than $1.9 million dollars.  These figures are conservative estimates – as numerous sales were occurring off of the markets (through direct deals, including direct deals with repeat customers who preferred to transact with the vendors off the markets).  The lucrative nature of the business was evident based on the approximately $370,000 in U.S. currency and money counter recovered in Defendant Ogando's residence, as well as the numerous wallets and ledgers seized from Defendant Spencer's residence.

Further, the disruption caused by the execution of the search warrants in this case resulted in the recovery of approximately 1,697 grams of pills pressed with fentanyl (11,728 pills) were recovered in Ogando's residence (packaged in bulk) along with 200 grams of pills pressed with fentanyl that were pre-packaged and ready to be shipped from the same residence.  Similarly, more than 1,300 grams of pills pressed with fentanyl were recovered inside of Defendant Dawodu's residence.   Together, these stashes of pills totaled approximately 3,200 grams (or 3.2 KG).

31

Removing these pills from the stream of commerce prevented those pills from making it to their final destinations in communities across the country.

The sophistication of this operation which was designed to evade law enforcement effectively functioned to pump kilograms of fentanyl pills into the community over the course of approximately five years.  The operation employed technologies that were designed to frustrate law enforcement's efforts to identify the source of the pills - including the use of darknet markets and encrypted messaging applications.  Defendant Dawodu purposefully directed individuals dropping packages containing pills at various locations to make it harder for law enforcement to identify how the pills were entering the mail stream (and make it more difficult to conduct surveillance to try to identify how packages were being mailed).  For instance, within the iCloud chat below, Defendant Dawodu and an unindicted co-conspirator discuss the locations for package "drops":





From:

**Anything else going out today/ tomorrow**

Status: Read
Read: 3/31/2020 6:56:32 PM(UTC+0)

3/31/2020 6:56:31 PM(UTC+0)

Source Extraction:
Legacy (1)
Source Info:
Production_1636976327.Extracted.zip/20387961_Production_2012141043/APLIC000002_A
PPLE_CONFIDENTIAL/1636976327_281304/Backup/1636976327/281304/mylifemylife2k
@post.com-
281304/backup/ID_69198866584bee3d7ffa9992921bc3222e16319d/3_C670292D-155C-
4C68-AEAD-B2758D9201FD/Library/SMS/sms.db : 0x43D924 (Table: message, handle, chat,
Size: 6979584 bytes)

From:

Attachments:

Size: 101423
File name: PHOTO-2020-03-31-14-57-45.jpg
PHOTO-2020-03-31-14-57-45.jpg

Status: Read
Read: 3/31/2020 7:04:23 PM(UTC+0)

3/31/2020 7:02:01 PM(UTC+0)





From: +17862          (786)          (owner)

Get ready for abt 11 am . 4 stops

Status: Sent

Delivered: 4/21/2020 12:34:04 PM(UTC+0)

4/21/2020 12:34:04 PM(UTC+0)

**B.     The History and Characteristics of the Defendant**

As detailed above, the defendant comes before this Court in Criminal History Category I, with no prior contacts with the criminal justice system (other than a traffic infraction for speeding and a *nolle prossed* arrest possession of less than 1 oz of marijuana in Jackson, Georgia).  Notably – and to the defendant's credit – he has no prior arrests or involvement in narcotics trafficking.  However, the scheme at issue in this case occurred over a prolonged period of time and the defendant and his co-conspirators' efforts to conceal their criminal conduct assisted in their ability to engage in criminal conduct undetected for the duration of the conspiracy.  Although the defendant has a history of some gainful employment; given the length of time that he was involved in trafficking fentanyl pills, it is clear that he was supplementing that income through his involvement in illegal narcotics trafficking.

**C.     The Need for the Sentence Imposed**

The government believes that a sentence of **144** months of incarceration, to be followed by five years of supervised release, is the appropriate sentence in this case.  A significant period of incarceration is necessary to serve as a deterrent for this type of dangerous and sophisticated form of flooding the country with kilograms of pills pressed with fentanyl.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:

_____/s/_____
Laura Crane
D.C. Bar No. 992454
Connor Mullin
D.C. Bar No. 981715
Assistant United States Attorneys
District of Columbia
601 D Street, NW, Washington, DC 20530

34

(202) 252- 7667 (Crane)
laura.crane@usdoj.gov
(202) 252-7079 (Mullin)
connor.mullin@usdoj.gov